D. Loren Washburn (#10993)
  lwashburn@smithwashburn.com
**SMITH WASHBURN, LLP**
8 East Broadway, Suite 320
Salt Lake City, UT 84111
Telephone: (801) 584-1800
Facsimile: (801) 584-1820

*Attorneys for Andrew Bachman*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTIRCT OF NEW YORK

| UNITED STATES OF AMERICA,<br><br>  Plaintiff,<br><br>v.<br><br>ANDREW BACHMAN,<br><br>  Defendant. | **SENTENCING SUBMISSION**<br><br>Case No. 1:15-CR-00253-001 (JMF) |
| --- | --- |

Defendant Andrew Bachman appears before this Court to be sentenced for crimes he committed as part of a business he got involved in shortly after he graduated from college with friends he had met in school. He admitted his crimes, pled guilty, and entered a cooperation agreement with the United States Attorney's Office in April 2015. Mr. Bachman has acknowledged his crimes not only through his guilty plea but through his early, substantial and frequent cooperation with the government in its prosecution of himself and others. Since that time Mr. Bachman has changed his life and his lifestyle, operating a small family-owned grocery store and becoming involved in his local community.

Mr. Bachman was the government's first cooperator. Because of his cooperation, the government likely saved substantial resources and uncovered parts of the fraud that they may not have discovered without his participation. It is no coincidence that the people about whom Mr. Bachman provided the most information – Lin Miao and Michael Pajaczkowski – pleaded guilty and cooperated with the government, becoming the star witnesses at the trial of the other defendants.

Not only did Mr. Bachman acknowledge his wrongdoing and cooperate, he has spent the years since he was charged building a new life operating a simple, honest business. He has been truthful and open with everyone in his life, acknowledging his crimes rather than telling those close to him self-justifying stories that minimize his misdeeds. This is because Mr. Bachman understands that turning from his fraudulent past requires acknowledgment of his crimes to the Court, to himself, and to those around him; making amends as possible; and, accepting the consequences of his acts. His efforts at rehabilitation have led him to openly acknowledge his crimes and to move forward on a different and socially productive path.

He asks this Court to impose a sentence that reflects the significant steps he has made in cooperation and rehabilitation, and a sentence that takes into account the Congressional mandate that his sentence should reflect his personal situation and the systemic needs identified in 18 U.S.C. § 3553(a). Given his conduct, his cooperation, and the sentences imposed on others in this case, a sentence of probation is appropriate for Mr. Bachman.

## <u>APPLICABLE LAW</u>

The Court is undoubtedly familiar with the general law applicable to the process of imposing sentence on a criminal defendant. Nonetheless it is set forward briefly here. Congress has directed the United States District Courts to "impose a sentence sufficient, but not greater than necessary," to reflect the seriousness of the offense conduct[1], to provide general and specific deterrence[2], to incapacitate the defendant from further crimes[3], and to assist the defendant in rehabilitation and obtaining life skills necessary for his future.[4] In fashioning that sentence, Congress directed Courts to consider, among other factors: "the nature and circumstances of the offense,"[5] "the history and characteristics of the defendant,"[6] and "the need to avoid unwarranted

---

[1] 18 U.S.C. § 3553(a)(2)(A)
[2] 18 U.S.C. § 3553(a)(2)(B)
[3] 18 U.S.C. § 3553(a)(2)(C)
[4] 18 U.S.C. § 3553(a)(2)(D)
[5] 18 U.S.C. § 3553(a)(1)
[6] 18 U.S.C. § 3553(a)(1)

sentence disparities among defendants with similar records who have been found guilty of similar conduct."[7] The Court must also calculate and consider the sentence recommended by the United States Sentencing Guidelines.[8] Although the guidelines sentence is an "important benchmark"[9] the Court may not "presume that a Guidelines sentence is reasonable,"[10] but must consider all the factors in a case to make an individualized determination.

## ARGUMENT

### I. MR. BACHMAN'S PERSONAL CHARACTERISTICS

As noted above, Mr. Bachman has changed dramatically since the time of his crimes. At that time he was a young man enamored by those he saw who made fast money by operating businesses with slick marketing and questionable products. At that time Mr. Bachman was young, had little life experience and made bad decisions – criminal decisions – that he likely would not have made later in life.

Since that time Mr. Bachman has made dramatic efforts to change his life. First, Mr. Bachman did not deny, to himself or to others, his involvement or responsibility for his crimes. Obviously one of the most important steps in that process was his guilty plea and cooperation, on which more later. However, he undertook this same acceptance of responsibility with those in his personal life. As Kristen Gramazio, a friend and former employee explained, "Andrew confided in me that he had a sincere understanding that his actions were immoral and wrong. In our many conversations about his troubles, he has never once tried to defend, minimize, or explain away his activities. Nor did he ever try to shift moral blame on others."[11]

Mr. Bachman has realized that the material excess and high living that were the object of his criminal conduct are neither personally fulfilling nor worth the harm they inflict on others including his victims and those closest to him. Mr. Bachman's sister relates an anecdote that

---

[7] 18 U.S.C. § 3553(a)(6)
[8] *United States v. Corsey*, 723 F.3d 366, 374 (2d Cir. 2013), as corrected (July 24, 2013)
[9] *United States v. Corsey*, 723 F.3d 366, 375 (2d Cir. 2013), as corrected (July 24, 2013)
[10] *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc).
[11] See letter of Kristen Gramazio, attached as Exhibit A

illustrates this point. Although she noted that since his plea Mr. Bachman's freedom to participate in events that require travel and other freedoms have been somewhat curtailed, "Not once did I hear him complain about his new reality. So, after teasing him about a pair of formerly purchased ugly-expensive shoes (in an older sister moment), I asked if he missed the fancy things. He, quite seriously, responded that he missed none of it. But that he regretted everyday bringing pain to his family."[12] As Mr. Bachman described in his statement to probation and to this Court, his regret extends not merely to the ancillary pain he has inflicted on his family but also to the victims of his crimes, from whom he and his codefendants stole money. As he reported to Probation,

> I harmed tens of thousands who were victims of my crime. It was simple to rationalize that we were only taking a little from each victim, but the reality is that the amount we stole for many represented the fruits of hours of hard work that we - I - stole from them. It was not just the money; the frustration and sense of betrayal they must have felt in trying to get their cell phone company to refund monthly charges they never authorized cost more than just the money we took. As I think about how frustrated, angry, and cheated my victims felt, I am disgusted with my actions. [13]

Since his plea, Mr. Bachman has taken steps to create a productive family-owned business that he manages and runs, and that could not be more different from the frauds he and his co-defendants operated years ago. Mr. Bachman's father became aware of an opportunity to revive a dilapidated grocery store and deli near Cape Cod, Massachusetts, and helped Mr. Bachman fund the business.[14] The process of opening this business required Mr. Bachman to engage in business planning, manual labor and community outreach. As Mr. Bachman's sister, Sharon Bachman, described, "Over the past several years Andy took a dilapidated, abandoned property and didn't just oversee its renovation, but physically worked himself to exhaustion daily until it was ready for opening (this included a bout of pneumonia)."[15] His daily operation of the business includes personally stocking shelves in the store, going to restaurant supply stores, and

---

[12] See letter of Meredith Bachman attached as Exhibit B. See also, letter of Tony Thomas attached as Exhibit E. ("I do not think money and a life of excess brought Andrew happiness, and I think he came to that realization after losing that life.")
[13] See PSR at ¶ 13
[14] See letter of Donald Bachman attached as Exhibit C.
[15] See letter of Sharon Bachman attached as Exhibit D.

attending to every detail of the business.[16]

In addition to becoming a productive member of his local community through operating an honest and valued business, Mr. Bachman has also found individuals in need and attempted to help them out. Perhaps the most publicly known example involved a local man named Harold Watt but known to the Hanover, Massachusetts, community as "Yellowman." Mr. Watt collected junk on his property and recycled what he could to acquire his spending money. He came under scrutiny from the town counsel who sought to foreclose on the property as a hazard. Mr. Bachman's grocery store, Rosa Farms, created T-shirts and donated all of the proceeds to Mr. Watt to help him clean up his property to avoid foreclosure.[17] Not only did Mr. Bachman help Mr. Watt from a distance, but he treated Mr. Watt with respect and dignity as a customer notwithstanding some of his idiosyncrasies. As Mr. Watt's attorney described his introduction to and interaction with Mr. Bachman:

> I discovered Andy Bachman who ran a local grocery store and deli. It was at this store that Harold Watt ate his meals everyday and where he was treated not as a problem but as a neighbor. As I learned more about Andy Bachman I learned that he also did similar "feel good" acts for seniors, veterans and almost anyone in need of a helping hand. . . I realized that he was a young entrepreneur who truly believed that whatever talent he has should be used to make his world better. Now whether that was always his goal or is a new found faith I really don't care. He is one of the few people that I have met of his generation who embraces the theory that a high tide raises all boats.

Rather than a new leaf Mr. Bachman had recently turned over, Mr. Bachman's attention to the needs of others was a return to the person he had been before his offenses. As Joseph Pearce, a friend who knew Mr. Bachman shortly after college related, "One part therapist, two parts mentor, I would have to say my timely friendship with Andy is one of the reasons I am still enjoying my professional career journey and am proud to be an established member of the

---

[16] See letter of Tony Thomas attached as Exhibit E.
[17] See https://www.facebook.com/RosaFarmsMA/posts/yellowman-is-my-homeboy-very/1799457436987755/ (Rosa Farms Yellowman T-shirt drive Facebook page).

4814-3464-9709, v. 1

Boston commercial real estate community, something that 10-years ago seemed impossible. Looking back on it, I was of no material value for Andy, broke financially and mentally, but he took me under his wing and changed my perception of what I saw when looking in the mirror which I cannot thank him enough for and will consider him a dear friend for life."[18]

In short, as nearly everyone who wrote a letter to the Court noted, Mr. Bachman's criminal conduct was an aberration.[19] Mr. Bachman has constructed a life in which employees and the community around him can and do depend on him. That he had an earlier aberrational episode of youthful greed, hubris and dishonesty is both to his life-long shame but also a reminder to him of the importance of the continuing the life he has constructed on a more solid and selfless foundation.

In sentencing Mr. Bachman, the Court should consider the substantial evidence that Mr. Bachman has publicly and frequently acknowledged his past bad conduct, expressed and demonstrated contrition, and that there is substantial evidence that Mr. Bachman's crimes are the aberration to his life in which he has demonstrated himself to be a person who cares about and cares for his local community and the people in it.

## II.    SENTENCING GUIDELINES

As noted in the final presentence report, Mr. Bachman has only one objection to the calculation of the sentencing guidelines in his presentence report. Mr. Bachman objects to the imposition of two points for obstruction of justice.

As an initial matter, the Presentence report is itself inconsistent on whether the obstruction of justice enhancement should apply. In Paragraph 69, the PSR reports that, "The probation officer has no information indicating the defendant impeded or obstructed justice." However, in Paragraph 84, while computing the guidelines, the PSR reports that "a two level increase is warranted as the

---

[18] See letter of Joseph Pearce attached as Exhibit F.
[19] See additional character letters attached as Exhibit G

defendant committed perjury as charged in Count 3." This apparent contradiction is a result of the fact that Mr. Bachman did not obstruct justice in this case; he did not, as is many times the basis for an obstruction of justice enhancement, commit perjury during a trial on the merits.[20] Rather, he cooperated, and his cooperation was extensive and reliable[21] to the government.

Notwithstanding that he did not obstruct justice in this investigation, Courts have held that perjury in a related civil investigation may warrant an enhancement for obstruction of justice "upon making specific findings that the defendant intentionally gave false testimony which was material to the proceeding in which it was given, that the testimony was made willfully, i.e., with the specific purpose of obstructing justice, and that the testimony was material to the instant offense." *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997). This case is factually distinguishable in a number of ways.

Two of the three alleged falsehoods in the perjury count to which Mr. Bachman pled related to his assets in a declaration made at the behest of a receiver appointed in the FTC case. Those two lies related only to that receivership and not, so far as Mr. Bachman is aware, to anything material to the present case. Those two statements could not form the basis of an obstruction enhancement.

The third admitted falsehood is admittedly a closer call but still did not obstruct this investigation. Mr. Bachman made false statements in a declaration that he was not aware of or involved in the auto-subscribing, or cramming, that is the basis for this criminal case. These statements were made as part of an unsuccessful opposition to the FTC's *ex parte* application for a preliminary injunction in its case against him. Mr. Bachman's primary argument, which was the focus of most of the 57-paragraph declaration, was that since he had been out of the mobile device business since 2012, the FTC could not show that there was present or reasonably anticipated future violative conduct and therefore there was no need for an injunction against him personally. This was coupled with the subsequent, and false, argument that Mr. Bachman did not know of the

---

[20] Indeed, there was no trial because he cooperated and pleaded guilty.
[21] The government acknowledged that Mr. Bachman's cooperation was reliable in a complaint filed against other defendants in this case, as explained in more detail below.

cramming and therefore the FTC could not meet its burden to show the need for an injunction against him based on his conduct. The Court rejected Mr. Bachman's arguments and granted the preliminary injunction; to Counsel's knowledge none of the parties in the civil matter ever relied on Mr. Bachman's false declaration again, nor did it ever have any effect on those proceedings. Indeed, only a few months later, before he was aware of the criminal investigation, Mr. Bachman settled with the FTC, agreeing to a judgment of more than $97,000,000, evincing acknowledgment that he had been involved in untoward conduct.

By the time Mr. Bachman was aware of the criminal investigation the false declaration seems to have become a distant memory relied upon by no one. Specifically, at that point Mr. Bachman had already settled with the FTC accepting a judgment of roughly $97,000,000 and various injunctive relief. Further, it appears that at no point after the filing of the opposition to the FTC's proposed preliminary injunction did Mr. Bachman ever stand by the statement that he did not know about the auto-subscribing. When he was confronted by the criminal investigators he explicitly disavowed the blanket denial during his first meeting with investigators, telling them candidly that he was aware of the fraud as were many others.

In contrast, in cases where courts in the Second Circuit have imposed an obstruction enhancement for a related civil case, the Defendant has typically known about the federal criminal investigation when he made his false statement. For example, in *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997), the Second Circuit found that the defendant "was aware of the federal investigation and that his knowledge of it was the motivation for his perjury in the state deposition."[22] At times the Second Circuit has observed that a defendant need not be aware of the criminal investigation for the false statement to constitute obstruction of justice,[23] however, here where the Defendant settled with the FTC agreeing to a judgment reflecting an acceptance of

---

[22] The Second Circuit found that even knowledge of the investigation and the investigation as the motivation for false deposition testimony was insufficient unless the false statements were material to the criminal investigation. The case was remanded to the district court for the Court to make findings that the false statements were material to the federal criminal case. *Id* at 111 F.3d 307, 328-330.

[23] *See, e.g. United States v. Fiore*, 381 F.3d 89, 94 (2d Cir. 2004).

responsibility for the loss before he was aware of the criminal investigation (and so far as Counsel is aware, perhaps before the criminal investigation even began) it is difficult to say that the false statement was ever material to the criminal investigation. This seems to be the rationale for the probation officer's observation in Paragraph 69 of the PSR that she had, "no information indicating [Bachman] impeded or obstructed justice."

In short, the statement in the FTC action was undoubtedly perjurious and criminal. It was equally clearly not actually obstructive of the criminal investigation. The Second Circuit has given the courts latitude to impose the obstruction of justice enhancement in many circumstances, and perhaps in circumstances similar to this one. However, that discretion also implies the ability to forgo the enhancement when the Court deems it appropriate. In this case, given the totality of the circumstances, the Court should find that the false exculpatory statement in Mr. Bachman's declaration was not material to or obstructive of the criminal investigation and should decline to impose the two-point enhancement.

Other than requesting that the Court not impose a two-point enhancement, Mr. Bachman does not object to the guidelines calculation by probation. However, a guidelines sentence would not be reasonable for the reasons identified below.

## III.   CALCULATING A REASONABLE SENTENCE FOR ANDREW BACHMAN

Having agreed that the Sentencing Guidelines are appropriately calculated, with a deviation of at most two points, the Court should move beyond that calculation and impose a sentence dramatically lower than the one recommended by the Guidelines. The sentence should be lower for three reasons:

(1)    **Cooperation**. Mr. Bachman was the first cooperator in the government's case, cooperating in the criminal investigation as soon as he was aware of it and before he was charged, and the government used the reliable information he gave them in their prosecution of others;

4814-3464-9709, v. 1

(2)     **Avoiding Sentencing Disparity**. The sentences imposed on others in this case are, with one exception, substantially below the guidelines applicable to them. This is true even for defendants who proceeded to trial and were convicted by a jury. Given Mr. Bachman's role in the offense and his cooperation, a sentence anywhere near the guidelines would create an unjust disparity resulting in Mr. Bachman being sentenced to the greatest sentence despite his lesser role and substantial and early cooperation.

(3)     **Mr. Bachman's History and Characteristics Warrant Leniency**. Mr. Bachman's personal characteristics at the time of the offense and since suggest that a sentence of incarceration, much less a sentence of years of prison as included in the PSR, is more than necessary to meet the statutory sentencing objectives.

(a)     **MR. BACHMAN'S COOPERATION WARRANTS A SENTENCE SUBSTANTIALLY BELOW THE APPLICABLE GUIDELINES.**

On July 10, 2018 the United States filed a letter to the Court advising the Court of Mr. Bachman's cooperation and activities related to the investigation against him. That memorandum comprehensively and accurately describes his timely, substantial, and valuable cooperation with the government. Rather than repeat information contained therein, Mr. Bachman will simply highlight a few points about his cooperation.

(1)     **The Government Relied on The Reliable Information Provided By Mr. Bachman To Support Its Case Against Co-Conspirators.**

Although the government's letter was filed only recently, the centrality of Mr. Bachman's statements to investigators has been evident for years. On May 26, 2015, approximately one month after Mr. Bachman entered his plea in this case, the government filed a complaint charging Lin Miao, Young Jason Lee, Michael Pearse, Michael Pajaczkowski, and Christopher Goff with money laundering and wire fraud conspiracies.[24] The person identified as CW-1 in the Complaint is Mr. Bachman.[25] There was only one cooperating witness identified and that the

---

[24] *See United States v. Lin Miao*, *et al*, 1:15-mj-01771-UA (the "Complaint")

[25] Mr. Bachman was never identified by name in the Complaint and has never been identified in a publicly filed document as a cooperating witness by the government, to Counsel's knowledge. However, given the specificity of the allegations, including identifying the role of CW-1 as

government relied on in the Complaint and supporting affidavit. The IRS Special Agent who signed the complaint explained that, "[Bachman]'s information has consistently been reliable and has been corroborated by other evidence in this case."[26] CW-1 was mentioned and identified as a source of information in dozens of numbered paragraphs or subparagraphs in the Complaint.[27] The Complaint reports that the information Mr. Bachman gave was a source of information against defendants Lin Miao[28], Michael Pearse[29], Young Jason Lee[30], Michael Pajaczkowski[31], and Christopher Goff.[32] The two people against whom Mr. Bachman gave the most direct information, Mr. Miao and Mr. Pajaczkowski later pled and entered cooperation agreements of their own. Because they had more specific information than Mr. Bachman, the government chose to call Mr. Miao and Mr. Pajaczkowski instead of Mr. Bachman at the eventual trial.[33]

The cooperation of Mr. Miao and Mr. Pajaczkowski, combined with Mr. Bachman's earlier cooperation, led to additional charges against additional defendants. On September 9, 2015, a few months after the Complaint referenced above, the grand jury returned an indictment charging Darcy Wedd, Erdolo Eromo, Yong Jason Lee, Michael Pearse, Yongchao Liu, and Christopher Goff with various crimes arising from the auto-subscribing scheme.[34]

As the government acknowledged, Mr. Bachman was the foundational witness for the government in this matter, leading directly or indirectly to eleven additional people being charged with crimes, all of whom were within the United States have pleaded guilty or been convicted by a jury.[35]

---

"Director of Global Sales at the Texting Company," after the Complaint was filed anyone with knowledge of the case (such as the defendants in the Complaint) would have immediately known that Mr. Bachman was cooperating with the government.
[26] Complaint at p. 7 fn 1.
[27] *See,* Complaint ¶¶ 15, 16, 18, 21, 24(b), 24(d), 24(e), 24(f), 25, 25(a), 25(b), 26, 26(a), 26(b), 27, 28, 31(d), 34, 35, 36(c), 37, 38, 39, 40, 40(a), 40(b), 40(c), 41, 41(e), 42(a), 42(b), 42(c), 42(d).
[28] *See, e.g.* ¶¶ 15, 16, 18, 25, 25(a), 27, 34, 35, 39, 40, 40(a).
[29] *See, e.g.* ¶¶ 15, 18, 37, 38, 38(a), 38(b), 38(c), 38(d), 38(e).
[30] *See, e.g.* ¶¶ 18, 27.
[31] *See, e.g.* ¶¶ 18, 25, 25(a), 25(b), 39.
[32] *See, e.g.* ¶¶ 18, 39.
[33] Gov. Sentencing Submission at p. 5.
[34] *See, USA v. Wedd et al,* 1:15-cr-00616-KBF, D.E. 51.
[35] Three of the parties charged are outside of the United States.

4814-3464-9709, v. 1

**(b)** **Mr. Bachman's Sentence As A Cooperator Should Be Informed By The Other Sentences Already Imposed In This Case.**

While Mr. Bachman's case is the only one pending before this Court, there are related cases involving a total of 13[36] defendants.[37] At the time of the filing of this sentencing memorandum, only a handful of those defendants have been sentenced: (1) Mr. Assifuah who pled on February 7, 2017[38] and was sentenced on September 15, 2017[39]; (2) Mr. Wedd was sentenced on April 2, 2018[40] after being convicted at trial; (3) Mr. Thompson was sentenced on January 12, 2018 after being convicted at trial;[41] (4) Mr. Murad was sentenced on May 3, 2018 after pleading guilty[42]; and (5) Mr. Goff was sentenced on May 18, 2018 after pleading guilty.[43]

**(1)** **The Defendants Who Have Been Sentenced To Date Have Almost All Been Sentenced To Below Guidelines Sentences, Including Probation**

All but one of the defendants sentenced to date were sentenced well below the applicable guidelines, including the two defendants who were convicted by a jury. Most of those cases were handled by Judge Forrest, although one related sentencing was handled by Judge Sullivan as well.

This Court and Counsel are at something of a disadvantage in making comparisons between the sentences imposed in the related cases because the Court did not preside over those cases, Counsel did not attend the trials or sentencings, and the government did not provide sufficient information in its sentencing submission to make precise comparisons between Mr.

---

[36] The government's recitation seems to leave out Jonathan Murad, who Mr. Bachman understands to be a related defendant, who worked for Mr. Pajaczkowski, charged in a stand-alone indictment.

[37] Defendants Darcy Wedd, Erdolo Eromo, Christopher Goff, Michael Pearse, Yongchao Liu, Jason Lee, Fraser Thompson, Eugeni Tsvetnenko, and Francis Assifuah were all indicted in a single case assigned to Judge Forrest, 1:15-cr-00616-KBF *USA v. Wedd, et al*. Defendant Lin Miao (who was identified as CC-1 in Mr. Bachman's Presentence Report) was charged in a stand-alone information, also assigned to Judge Forrest, 1:15-cr-00628-KBF *USA v. Miao*. Defendant Michael Pajaczkowski was originally charged in a complaint together with Mr. Miao, but apparently since then has been charged in a separate (presumably still-sealed) case. Defendant Jonathan Murad was charged in a sealed information on April 3, 2017, which was assigned to Judge Sullivan, 1:17-cr-00209-RJS.

[38] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 259.

[39] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 502.

[40] *USA v. Wedd, et al* 1:15-cr-00616-KBF, unnumbered minute entry dated 4/2/2018.

[41] *USA v. Wedd, et al* 1:15-cr-00616-KBF, unnumbered minute entry dated 1/12/2018

[42] *USA v. Murad* 1:17-cr-00209-RJS, unnumbered minute entry dated 5/3/2018

[43] *USA v. Wedd*, et al 1:15-cr-00616-KBF, unnumbered minute entry dated 5/18/2018.

4814-3464-9709, v. 1

Bachman's culpability and that of others in the scheme. Also, the Presentence Report, another potential source of information to aide comparison of culpability, does not make any effort to inform the Court of Mr. Bachman's role compared to others or to make a serious sentencing recommendation in light of the other sentences imposed on other defendants so far.[44] However, both the government and Judge Forrest have given some guideposts of relative culpability in other cases that may help the Court in understanding the relative culpability, and relevance of the sentences of these other individuals and how that should inform the sentence imposed on Mr. Bachman.

### (A)    *Darcy Wedd*

At Mr. Thompson's sentencing, in January, Judge Forrest observed the relative culpability of various parties, including Mr. Thompson, Miao, and Mr. Wedd. Judge Forrest who presided over a mistral followed by the trial that led to the convictions observed that:

> [T]he right grouping of culpability is Wedd, Pajaczkowski, and I'm not doing them in order, although Eromo and Pajaczkowski I'd probably put right next to each other, **I would put Wedd probably at the top**, so, that's not too far off. But Miao has got his own special category, and Mr. Thompson after that. So in that grouping I would agree with you that Mr. Thompson is the least culpable. But I would put to the side for the moment any argument that he's anywhere near Mr. Lee.[45]

Thus, according to Judge Forrest, who presided over two mistrials before the final trial at which Mr. Wedd was convicted, Mr. Wedd was the most culpable in the entire scheme.[46] The government agreed: according to the government's sentencing memorandum, Mr. Wedd "was at

---

[44] That Probation did not make an actual recommendation in the final presentence report seems obvious from a number of factors. First, as illustrated below, all the other defendants who have been sentenced, even the defendants who were convicted at trial, received below-guidelines recommendations from probation; Mr. Bachman seems to be the only defendant for whom Probation has recommended a guidelines sentence. Second, by any measure Mr. Bachman was a middle-of-the-pack participant in this crime, he was not the "epicenter" of the fraud like Mr. Wedd, but if the Court were to impose the sentence recommended by Probation on Mr. Bachman, he would be the most severely punished defendant by a substantial margin. Third, Probation fails to factor in Mr. Bachman's cooperation in making its recommendation.

[45] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 665 at p. 30 (emphasis added).

[46] Because Judge Forrest said that Mr. Miao had his "own special category" it is possible she considered Mr. Miao equally culpable to Mr. Wedd, but it is not clear.

4814-3464-9709, v. 1

the epicenter of a massive fraud that stole money from millions of Americans. He was remorseless for this conduct during the time period of the conspiracy."[47]

Mr. Wedd did not plead guilty, never accepted responsibility, and has appealed his sentence. Obviously, then, he did not cooperate with the government or provide assistance in the prosecution of anyone else.

Mr. Wedd's guidelines were calculated at Level 45, which corresponds with a life sentence. Because the statutory maximum sentences for the counts of Mr. Wedd's conviction totaled 120 years, that was his recommended guidelines sentence. Notwithstanding that guidelines sentence, the Probation Office recommended a sentence of 180 months, Mr. Wedd asked for a sentence of 84 months, and the government asked for a sentence of at least what Probation recommended.[48] The Court sentenced Mr. Wedd to 72 months for the fraud and conspiracy, plus two consecutive sentences of 24 months each on counts of aggravated identity theft, for a total of 120 months.[49]

Mr. Bachman was not charged with, and did not participate in, aggravated identity theft. Thus, for the scheme for which Mr. Wedd and Mr. Bachman were both charged, Mr. Wedd received a sentence of 72 months, even though he was, according to Judge Forrest, the most culpable in the scheme and he did not cooperate or plead guilty.

### (B)     *Frasier Thompson*

Judge Forrest found that Defendant Frasier Thompson was much less culpable than Mr. Wedd. Apparently, she judged the culpability to be, from most culpable to least culpable: Wedd, Eromo, Pajaczkowski, Miao, Thompson, and Lee.[50] Nonetheless, the Probation Office recommended a sentence of 144 months, Mr. Thompson asked for a sentence of 36 months, and the United States recommended a substantial sentence of incarceration. Mr. Thompson was

---

[47] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 677 at p. 1.
[48] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 677 at p. 1.
[49] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 700.
[50] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 665 at p. 30. Because he was Mr. Miao's subordinate, Mr. Bachman would necessarily be less culpable than Mr. Miao. However, where he would fall relative to the others on Judge Forrest's scale is unknown.

sentenced to 60 months, 24 months for a single count of aggravated identity theft and 36 months for the fraud conduct.[51]

Thus, for the conduct for which Mr. Thompson and Mr. Bachman were both charged, Mr. Thompson – who proceeded to trial and was convicted by a jury – was sentenced to 36 months, though the Court apparently believed even without the identity theft conviction the sentence would be the same.[52]

### (C)    *Christopher Goff*

Mr. Goff initially proceeded to trial. He pleaded guilty only after the first jury was hung and could not reach a verdict on any defendant on any count.[53] Only after the mistrial was declared did Mr. Goff finally accept responsibility for his conduct and pleaded guilty.

Although the transcript is not entirely clear, it appears that Judge Forrest found that Mr. Goff was more culpable than Mr. Thompson.[54] Nonetheless, because he pleaded guilty and was credited with acceptance of responsibility, Judge Forrest sentenced Mr. Goff to a total of 30 months, a below guidelines sentence, half of Mr. Thompson's total sentence and six months less than Mr. Thompson's fraud-based sentence.[55]

Thus, for his participation in the fraud that Mr. Bachman is charged with, Mr. Goff, who was apparently somewhere between Mr. Wedd and Mr. Thompson in culpability, and who proceeded to trial once before eventually pleading guilty, was sentenced to 30 months. Mr. Goff

---

[51] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 654.

[52] Mr. Thompson was sentenced to 36 months for the fraud and conspiracy counts and to 24 months for aggravated identity theft. The statute requires that the 24 months be added to any other sentence, and thus the 36 months should, under the statute, reflect the full sentence Judge Forrest believed was appropriate for Mr. Thompson's fraud alone. However, Judge Forrest made it clear that she believed a five-year sentence was appropriate for Mr. Thompson's overall conduct and that if the aggravated identity theft conviction were reversed she would likely impose a five-year sentence at Mr. Thompson's re-sentencing. See *USA v. Wedd, et al* 1:15-cr-00616-KBF D.E. 665 at 51 at lines 8-23.

[53] *USA v. Wedd, et al* 1:15-cr-00616-KBF, unnumbered docket entry dated 5/3/2017.

[54] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 665 at p. 29-30.

[55] According to the government's sentencing submission in Mr. Goff's case, his sentencing guidelines range was 46 to 57 months imprisonment, the Probation Office recommended 36 months, Mr. Goff asked for 12 months, and the government asked for a guidelines sentence. *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 704 at p. 1.

4814-3464-9709, v. 1

cooperated, if at all, only after he had already been indicted and gone to trial, which resulted in a mistrial.

### (D)   *Francis Assifuah*

Francis Assifuah operated a content provider, much like Tatto, although much less involved and for a much shorter time. He worked with the defendants at Mobile Messenger – Mr. Wedd, Mr. Thomson, Mr. Pajaczkowski, and chiefly Mr. Eromo – to auto-subscribe transactions through his company, but only for a month. Mr. Assifuah was the first of the defendants to be sentenced. He negotiated with the government to get a loss figure in his plea agreement that led to a guidelines calculation of 33-41 months.[56] Mr. Assifuah was the only one of the defendants sentenced to date who received a guidelines sentence.[57] This is likely in part due to the fact that Mr. Assifuah was apparently not truthful in his meetings with the government and minimized his role in his descriptions to them.[58]

### (E)   *Jonathan Murad*

Mr. Murad had a sentencing guidelines calculation not unlike Mr. Bachman's. Specifically, his loss figures were the same as Mr. Bachman's. The Probation Office calculated his guidelines level lower than Mr. Bachman's because he was adjudged to be a minimal participant and did not receive an enhancement for obstruction of justice, resulting in a six-point lower guidelines level.[59]

Mr. Murad was a subordinate of Mr. Pajaczkowski and, since the Probation Office recommended that he receive a minimal participant reduction, presumably he was relatively low level. In any event, Mr. Murad's sentencing-guidelines-recommended sentence was substantial: according to his sentencing memorandum Mr. Murad was a level 28 under the guidelines,

---

[56] The chief factors making Mr. Assifuah's sentencing guidelines lower than Mr. Bachman's are a lower loss figure ($550,000 to $1,500,000 for 14 points compared to Mr. Bachman's loss at more than $65,000,000 for 24 points) and that Mr. Assifuah received a two-point reduction for being a minor participant. *See USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 498 at 3.
[57] Probation recommended a sentence of 18 months, which Judge Forrest exceeded. *See USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 498 at 3.
[58] *USA v. Wedd, et al* 1:15-cr-00616-KBF, D.E. 557 at p. 13 lns. 4-21.
[59] *See, USA v. Murad,* 1:17-cr-00209-RJS, D.E. 27 at p. 2-3.

corresponding to 78-97 months. Nonetheless, Judge Sullivan sentenced Mr. Murad to three years of probation, and no incarceration.[60] While counsel would not have any basis to know of contrary information, there is nothing in the record to suggest that Mr. Murad was a cooperator, much less and early and foundational cooperating witness like Mr. Bachman.

**(2)**      **The Sentences Imposed To Date Suggest That A Sentence Of Probation Would Be A Reasonable Sentence.**

The sentences imposed on other defendants in this case are substantially below the guidelines sentence calculated for Mr. Bachman. Importantly, three of the defendants who have been sentenced proceeded to trial at least once, none was a cooperator, and none pled so early in the process as Mr. Bachman, who had pleaded guilty before any of the other defendants in this case was even charged. To Counsel's knowledge, none was the subject of a Section 5k1.1 Motion by the government.

Mr. Goff's and Mr. Thompson's sentences are illustrative. Both Goff and Thompson had a significant role at Mobile Messenger. Judge Forrest who presided over multiple iterations of the trial before sentencing Goff or Thompson – both of whom were defendants at the early iterations of the trial – found that they were less culpable than Mr. Wedd, but still very involved in the fraud. Nonetheless, the Court sentenced Thompson to a total of five years and sentenced Goff, who had the benefit of a plea agreement and receiving acceptance of responsibility, to 30 months.

Perhaps an even better signpost would be the sentence of Mr. Murad. Mr. Murad's sentencing guidelines, as noted above, were similar to Mr. Bachman's although he received a four-point reduction for being a minimal participant and did not receive a two-point enhancement for obstruction as Probation recommended for Mr. Bachman. Nonetheless, Judge Sullivan sentenced Mr. Murad to probation without any incarceration. And so far as counsel can tell, Mr. Murad did not receive a 5k1.1 Motion.

---

[60] *See*, *USA v. Murad*, 1:17-cr-00209-RJS, D.E. 28.

Given the sentences imposed on others in this case, and taking account of his substantial, early, and effective cooperation, the Court should impose the same sentence on Mr. Bachman as was imposed on Mr. Murad: probation.

**(c)** **Mr. Bachman's Participation In This Fraud Was An Aberrational Act of Youth That Is Not Representative Of His Character**

Andrew Bachman is still a young man, but he was much younger at the time he began his involvement in the fraud for which he will be sentenced by this Court. Andrew met Lin Miao shortly after he graduated from Babson College. Mr. Miao was a student who was starting a business with two of Mr. Bachman's friends, twin brothers whom he had met in college and who were finishing their last year in college. At the time, before the economy had recovered from the great recession, jobs were scarce. The young men together had the youthful exuberance and hubris that has led to numerous start-up businesses conceived in college campuses throughout the years.

Nonetheless it bears noting that Mr. Bachman was not the architect of the scheme and frankly, lacked the technological prowess to pull it off. Rather, he was a people person who could and did interact with others, wining, dining and schmoozing them to get them to help the scheme along. At that point Andrew should have left; he did not.

To be sure, Mr. Bachman's criminal conduct is a serious matter. He has not hidden it, unrepresented its seriousness, or blamed others in his conversations with friends and family. Nonetheless, as reflected in the letters and statements from his family and friends,[61] his criminal conduct is an aberration and based upon the changes he has made in his life there is every reason to believe it will not reoccur.

## CONCLUSION

Mr. Bachman asks that he be sentenced to probation. As noted above, he was the government's first cooperator and a foundational witness in their investigation and prosecution of a dozen co-defendants. Those defendants who have been sentenced have all been sentenced

---

[61] See Section I above.

well below the sentencing guidelines. Those like Mr. Bachman who were not the architects or leaders of the scheme have been sentenced to sentences of five years (for a defendant who went to trial) 33 months (for a defendant with prior criminal history) and 30 months (for a defendant who pleaded guilty after initially challenging the government's evidence at a trial that ended in a mistrial) and probation (for a minor participant with sentencing guidelines loss calculations similar to Mr. Bachman's). Mr. Bachman, who cooperated early and substantially, should be sentenced to a more lenient sentence than those who challenged the government's evidence at trial. Given the evidence of his pre and post offense character and his substantial cooperation with the government an appropriate sentence for Mr. Bachman would be probation. Mr. Bachman requests that the Court impose that as his sentence.

DATED: July 18, 2018

SMITH WASHBURN, LLP

_____/s/ D. Loren Washburn_____
D. Loren Washburn
*Attorneys for Andrew Bachman*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2018, the foregoing **SENTENCING SUBMISSION**

was served on the person(s) named below via the Court's electronic filing system:


Christian R. Everdell
Richard A. Cooper
Sara E. Paul
UNITED STATES ATTORNEY'S OFFICE
One Saint Andrew's Plaza
New York, NY 10007

/s/ Melina Hernandez

4814-3464-9709, v. 1

# Exhibit A

Dear Judge:

I have known Andrew Bachman since 2010 and I write this character reference letter to express my support.

I was fortunate enough to meet Andrew 8 years ago. Throughout those years we've worked together in a variety of areas related to his business ventures, laughed together, respected each other and I have not only developed a great respect for Andrew as a businessman, as an employer, but also as a human being. I consider Andrew a close personal friend.

Andrew discussed his troubles with me almost immediately after he became aware of the criminal investigation. From the beginning, Andrew expressed great remorse for his action. He showed genuine regret not merely for the criminal or civil liabilities he faced, but for the wrong to which he contributed. When I asked him why he never told me what was going on behind closed doors; he responded that he wanted to protect me from any wrong that was being done and didn't want me involved in any manner and the less I knew the better.

Andrew confided in me that he had a sincere understanding that his actions were immoral and wrong. In our many conversations about his troubles, he has never once tried to defend, minimize, or explain away his activities. Nor did he ever try to shift moral blame on others. As surprised as I was that Andrew had engaged in behavior that was completely out of character for the man I knew him to be, the one who I believe was more surprised than me was Andrew himself. Andrew knew he was above such behavior and was, and remains, ashamed that he had fallen so far below his own standards for himself.

Andrew is a man that frequently volunteers and strives to contribute to our community. I am forever grateful to Andrew for inviting me to accompany him one Saturday for an afternoon of fun.

When I asked Andrew what we were doing in (city/town name), he told me that we would spend the day mentoring under privileged kids. After speaking to these kids in a large group, he sat side by side with many of them who had more questions for him after. While Andrew offered guidance from the perspective of a successful employer, I sat in awe of his ability to inspire and guide people, offering whatever insight I could. By the end of the day, I could see in many of the kids faces that they looked up to him and wanted to strive to do better in school to be successful like Andrew. I walked away from that day, grateful for the experience.

Another experience that shows Andrew's generosity to the community was when he donated $100k to help underprivileged kids have a Christmas. He gave 100 kids in the community $100 to go shopping at Dicks Sporting Goods and to see the grateful faces looking up at Andrew and thanking him for giving them their first Christmas with gifts was a memory I will never forget.

Andrew is a good person. Since I've known him for almost decade, I truly believe his wrongful actions represent an aberration that he will never repeat. He has demonstrated honesty, integrity, and fairness in more than 100 transactions in which I have been directly involved. Andrew is a loving person, and conscientious citizen.

Thank you, Your Honor, for taking these thoughts into consideration as you deliberate on the appropriate sentence. I stand ready to offer further support to Andrew as he may require.

Respectfully,

Kristen Condon

# Exhibit B

April 20, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007


Your Honor,

I appreciate you taking the time to read this character reference, in support of my younger brother Andrew Bachman. I would like to use this opportunity to help you understand why, I believe, Andrew made the mistakes he made. To be clear, I am not trying to offer excuses. (I understand that he plead guilty to crimes related to illegal marketing practices and know that he takes full responsibility.) Rather, I am trying to explain why I am so confident that he will travel a very different path in the future and will channel all his many strengths and his deep motivation to connect with, help, and nurture others in a way that contributes positively to his community.

Andrew and I share parents that are very loving but are also very accomplished. I think that we both grew up inferring that the high expectations they set for themselves were there for us as well. And, in turn, we both made serious mistakes in our twenties that were misguided efforts to make our parents proud by proving we were strong, self-directed, motivated and would find successful. (My crimes – excessive focus on athletics and poor nutrition – were very different than Andrew's but nonetheless were an example of a desire to prove myself going completely awry and hurting the very people I most wanted to please and impress.)

Andrew knows that he made poor choices and, even more importantly, he recognizes that those poor choices were completely antithetical to the person that he most wants to be. I am not, at all, worried that he will make similar mistakes again. This is not because he is afraid of traditional punishment but because when he came to understand that his actions hurt both those closest to him and perhaps people he has never met, it was probably the most severe punishment.

To illustrate the point above: Four years ago, Andrew's lifestyle changed significantly. He lost the freedom to do so many things I take for granted from the obvious, such as traveling and building a career, to the less obvious, such as finding a life partner and thinking about starting a family (which is hard to do when the future is so uncertain). Not once did I hear him complain about his new reality. So, after teasing him about a pair of formerly purchased ugly-expensive shoes (in an older sister moment), I asked if he missed the fancy things. He, quite seriously, responded that he missed none of it. But that he regretted everyday bringing pain to his family.

Since this letter is ultimately about character, I would like to end with a snippet that illustrates Andrew's warmth, openness, and ultimate desire and ability to support others. Andrew's niece and nephew, my 4-year old twins, were born just days after he learned of the charges he is being sentenced for now. They were born weighing less than 1.5 pounds each and it was the most frightening period of my life, to date. Despite his own calamities, Andrew came to visit. I remember one of the most comforting moments in those first few weeks was having my brother stand with me and -- despite the wires, tubes, machines,

and sounds – really look at the twins and then tell me it would be okay. We both knew that the babies might not be okay. But Andrew was reminding me that I was not alone and he was there to love me and my children too no matter his own struggles. That is the real Andrew.

Should you need to contact me for any reason, I can be reached at (212) 777-5053.

Best,
Meredith Bachman

6406 8th street NW
Washington, DC  20012
mab300@nyu.edu

# Exhibit C

Donald Bachman MD
2 Mayona Circle
Box 1317
East Orleans  MA 02643
dbachmanmd@yahoo.com


The Honorable Jesse M.  Furman
United States District Judge Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York NY  10007

April 4, 2018

Dear Judge Furman,

I am writing to you on behalf of my son, Andrew R. Bachman, who is scheduled to appear before you. I have had a close and warm relationship with him throughout his life. He is a kind, affectionate, generous and loyal individual and the illegal activity he acknowledged took me by complete surprise as it does not fit with the individual I know and love.

By way of background, my wife and I recently retired after practicing medicine in the Boston area for over 40 years. Andrew is the youngest of three children. His older sisters were both excellent students and highly motivated. The oldest is a surgeon in Northern Virginia and the younger is a PHD behavioral psychologist working for the US Department of Education. Andrew, while exceptionally bright and creative has had attention deficit disorder which made his educational performance challenging, especially compared with his siblings. This was very frustrating for him but in a Montessori primary program and with therapy support, he made great progress, and integrated back into public school at middle school level. Even at elementary school he had a strong sense of fairness and would come to the support of other kids who were being picked on. He would make friends with kids from all social and ethnic backgrounds without passing judgment. He has always given people the benefit of the doubt and does so now. In middle school, he volunteered to read to a blind child in the community.  He was small for his age but a good athlete. In high school he made satisfactory grades but had testing difficulties because of his ADD. A great positive influence was his involvement with wrestling. He had supportive coaches, could compete with others of his size and learned the importance of individual effort while being part of a team.  He was elected team captain his senior year and received an award for his dedicated team effort. He could be counted on to mentor and help younger athletes.  One of his closest friends was a young man who bused in each day from a poor Boston neighborhood who would often stay with us.

Andrew was slow to mature and after high school did not have a clear focus of what he wanted to do. We agreed for him to take a gap year during part of which he studied in Oxford, reading subjects with tutors and then worked on a fishing boat in New Zealand. With this added perspective, he realized his strengths were in business and relationships and was admitted to Babson College, where he did very well academically. He made many friends and was always generous with his time to help other students. Unfortunately, he was exposed to friends from extremely wealthy backgrounds and others who saw a fast path to wealth through the financial industry. At home we had always lived modestly and did not

encourage ostentatious materialism, but it seems Andrew thought that wealth and possessions would enhance his prestige.  With maturity I believe he has seen this to be an error, but at the time this may have contributed to being seduced down the wrong path. I truly do not think he intended to engage in illegal activities but he should have been more self-critical. After graduation and earning money, he established a scholarship at Babson, and regularly came back to teach and mentor entrepreneurship. Press and peer recognition was very gratifying for him. Then the bubble burst

After the Federal Trade Commission seized his assets, he went from affluence to being penniless. To his credit, after the shock wore off, he began working hard to keep himself afloat. He did not indulge in self-pity and did not seek to blame others for his predicament. Through friends an opportunity to revive a defunct business came up and I was able to provide some money to allow him to open a retail produce and deli business in Hanover Massachusetts. He had to learn from scratch and did everything from carpentry to management. For several years he has worked long hours, 7 days a week, and we now provide employment for about 12 other people. He has helped many people in his town by giving them space to sell cottage industry wares such as honey and soaps. When an indigent neighbor near the store was threatened with eviction and homelessness, he mounted a community campaign to help "The Yellow Man" as he was known and raised money to help the man stay in his home. This selflessness is typical of Andrew's nature.

I believe Andrew has learned his lesson. He has been law abiding, hardworking and helpful to others. Confinement would not serve either his rehabilitation or the interests of society and would in fact put a dozen other people out of honest work. He has lived under a sword of Damocles without giving up and he is a fine young man. Please give him the opportunity to get on with his life.

Sincerely,


Donald Bachman

# Exhibit D



The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

May 6, 2018

Dear Judge Furman,

I am writing in support of my brother, Andrew Bachman.  Andy is 10 ½ years my junior and as his eldest sibling, I remember helping to take care of him when he was a small child.  Academic achievement was important and valued in our family; our parents expected it of us, and my sister and myself both have doctorate degrees.  I can only imagine how difficult this environment of expectations must have been for my brother, who struggled with school when he was young due to attention deficit disorder.  He began to thrive when my parents enrolled him in a Montessori school, which along with careful use of medication, gave him the support he needed to focus.  He was able to transition back to our town's public high school, known for its academic strengths, his freshman year.  I recall coming home from Medical School on a Saturday and going down to the high school field house with my parents to watch Andy in a varsity wrestling match.  It was torture for me; just watching his (then) lightweight frame strain in impossibly painful positions as he grappled on the mat was difficult to endure.  Yet he loved wrestling and he participated for all 4 years of high school.  I think wrestling gave him a sense of focus, the comfort of belonging to a team, and he realized the payoff of discipline and hard work.  This led to the confidence, insight and maturity to recognize he wasn't ready for college right after high school.  The semester of business courses he took at Oxford University in England the next fall confirmed his love of business and he matriculated at a business-focused school, Babson College in Wellesley, MA, the next fall.


It was fascinating to watch Andy's intellectual curiosity come alive when he finally found his passion; the kid who had to be cajoled into reading was now a young man who was so excited about his classes, his professors, and the industry mentors he met that he gushed about school.  This is all the more interesting because business was rarely the topic of discussion at our dinner table.  But perhaps he was predisposed to it, as one of Andy's innate skills that I admire is his ability to talk to anyone; while I am comfortable in my professional life talking to patients and peers, I find cocktail party full of strangers can be social hell.  Andy, on the other hand,

**Sharon Bachman, MD, FACS**
**Associate Professor of Surgery, Virginia Commonwealth University**
**Medical Director, Continuing Medical Education, Inova System**
**Director of Minimally Invasive Surgery, Inova Fairfax Hospital**
**Surgical Clerkship Director**
3300 Gallows Road, Falls Church, VA  22042
**P** 703.776.3563  **F** 703.776.2338
*www.inova.org*

is comfortable approaching anybody, from all social strata.  They could be captains of industry, the guys in the surrounding seats at a Celtics game, or the down-on-his-luck Hanover town eccentric whom he has befriended (and whom Andy has helped to keep his home, raising funds through sales of logo merchandise at his store); he can almost immediately connect with people.  He genuinely seems to enjoy all of these friendships non-prejudicially, without being overly awed by wealth or concerned with status, and his new friends enjoy his company as well.  He is a natural social connector, constantly thinking about which of his acquaintances would benefit by meeting each other.  I think this is why he enjoys business so much.  Financial success is a marker of a good business, but it is the human connection that he lives for.


I understand little of the technical aspects of the charges that were brought against Andy, but I did see how significantly they affected him.  He went through an initial period where it was clear his self-identity had been fundamentally altered, and instead of the confident, animated person I was used to, he was anxious, withdrawn and unmoored.  This has been a long legal process, and I think how Andy has managed this situation speaks to his character.  He found a new, constructive project to immerse himself in, and I am not surprised that this enterprise involves food.  We are the kind of family that will plan the dinner menu at breakfast, and meal preparation is often a several-hour long collaboration between multiple family members. All three of my mother's children are able to cook well, as we all spent many hours with her in the kitchen while she made most of our family's meals (all while working full time).  Over the past several years Andy took a dilapidated, abandoned property and didn't just oversee its renovation, but physically worked himself to exhaustion daily until it was ready for opening (this included a bout of pneumonia ).  He now runs a beautiful local grocery, a species that has become hard to find in suburbia in our era of big box stores and national chains.  In addition to the produce and cheese, the deli, the gourmet foods and foods appropriate for those with allergies (our nephew was diagnosed with Celiac disease at age 2), his store includes a coffee shop and juice bar with comfortable seating to encourage clientele to stay and socialize.  I personally have witnessed the evolution of this space, as whenever I fly to Boston to visit the family he will offer to pick me up at Logan, but the price of my ride is always a trip to Hanover to see how things look at Rosa Farms.   His pride in his establishment is palpable and he is always thinking about new ways to improve the offerings.  I am very proud of him that during these years of an uncertain future, rather than drifting aimlessly, his love for business, his identity, has been channeled into creating and maintaining a venue that is positive for a whole community.

**Sharon Bachman, MD, FACS**
**Associate Professor of Surgery, Virginia Commonwealth University**
**Medical Director, Continuing Medical Education, Inova System**
**Director of Minimally Invasive Surgery, Inova Fairfax Hospital**
**Surgical Clerkship Director**
3300 Gallows Road, Falls Church, VA  22042
**P** 703.776.3563  **F** 703.776.2338
*www.inova.org*



I love my brother and he is an integral part of our family.  His spot-on impressions keep us in stitches (sometimes I think he missed his calling as a comedic actor), he is always up for activity, and he has made a great effort to be present for family events, even under his current circumstances.  He has doted on our niece and nephew, who were critically premature at birth but thankfully have grown into healthy little people.  I humbly request that you please take the following into your deliberations. It has been my understanding that incarceration serves two purposes, punishment and rehabilitation.  In my opinion, establishing and running a successful local business, creating jobs and contributing to the local economy, becoming part of the community and functioning as a constructive member of society is an ultimate goal of rehabilitation and Andy has achieved that.   A sentence that avoids incarceration would allow him to continue his momentum as a positive, contributing citizen.


Respectfully Submitted,


Sharon Bachman, MD FACS
Falls Church, VA

**Sharon Bachman, MD, FACS**
**Associate Professor of Surgery, Virginia Commonwealth University**
**Medical Director, Continuing Medical Education, Inova System**
**Director of Minimally Invasive Surgery, Inova Fairfax Hospital**
**Surgical Clerkship Director**
3300 Gallows Road, Falls Church, VA  22042
**P** 703.776.3563   **F** 703.776.2338
*www.inova.org*

# Exhibit E

Anthony Thomas III
1 Erica Dr
Lincoln, RI 02865
March 29, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Furman,

My name is Anthony Thomas and I attended Babson College with Andrew Bachman from 2002 to 2006. We lived on the same floor in the dormitories in a special interest housing dedicated towards investing and often shared business ideas with one another. Andrew's dorm was directly next to mine and I often admired the amount of discipline he had. In the classes we took together he was always the most engaged individual in the classroom, often delivering valuable insight to discussions. While many of us were focused on having fun and enjoying our final years as "kids," Andrew was many years ahead of us already launching ventures such as a clothing company and an ATM business in the watering holes we frequently visited.

Within our housing he was often seen as a motivational type figure, who would encourage innovation amongst our fellow residents and push people to reach and exceed their goals. Similar to me, whose family lived within close proximity to the campus, he would often spend time with family and that was clearly the most important thing in his life. In 2013, I watched him stand alongside his Grandmother as she fought for her life in a New York City hospital, and he was there during her passing that summer. He had a lot going on at that time and put everything on hold, showing the importance he placed on family in his life.

One of Andrew's strongest character traits is that he treats everybody equally and I think that is a result of his upbringing. I have seen Andrew interact with powerful business leaders and he converses with them the same as the way he does with a busboy or a maintenance person. He is also somebody that you can rely upon in a time of need. Throughout my life I have struggled with mental illness, particularly from 2010-2014 and Andrew was always there as a friend for me. Whether it was dragging me out of my house to go play a round of golf, or having stay with him for a few days, he was one of the few people who actually had compassion and understanding for what I was going through. He would often relay medical opinions from his family to me, which was very helpful in me returning to good health. He pushed me to exercise

and practice good diet which is instrumental in tackling mental illness. At a time when many of my friends and even family didn't show much compassion or concern, Andrew did. And I will never forget that.

Over the past five years I have seen Andrew go from the highest of highs to the lowest of lows. I spent a lot of time with him last summer at the market he works at, tagging along on Restaurant Depot trips and watching him manage his inventory. We would stock shelves together afterhours and then head into a local Chinese restaurant in Hanover where everybody from the bartender to the locals dining at the bar knew him, and all welcomed him with a smile. I can say with confidence that last summer was the happiest I have seen Andrew in his life. He was content with his current situation, finding his work at the market fulfilling, spending the majority of his weekends with his family and raising the most instrumental figure in his life, his dog Axel.

I do not think money and a life of excess brought Andrew happiness, and I think he came to that realization after losing that life. He was able to determine who his true friends were after many distanced themselves or even removed themselves from him. I think he has now found a balance in life and obtained true happiness after realizing the importance of certain things such as family, friends and a fulfilling career. I strongly believe that he is a changed person. I am also confident that placing him on probation would be beneficial to allow him to continue to stay on the path he is on now towards a happy and healthy life.

Best,

Anthony Thomas III

Exhibit F

Joseph B. Pearce
153 Milk Street, Apt. 6E
Boston, MA 02109

April 8, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Furman,

I am writing on behalf of Andrew "Andy" Bachman, a close friend since 2007 and someone whom will be appearing before your court for sentencing on June 5, 2018. I first met Andy shortly after graduating from college, while I was working in a sales role for a commercial real estate firm in Boston. Myself hailing from a blue-collar commercial fishing family on the Jersey Shore didn't exactly fit the pedigree of my peers in the business world, creating for the first time in my life, a feeling of negative self-worth and it was really difficult for me to find my way, that is until I met Andy. One part therapist, two parts mentor, I would have to say my timely friendship with Andy is one of the reasons I am still enjoying my professional career journey and am proud to be an established member of the Boston commercial real estate community, something that 10-years ago seemed impossible. Looking back on it, I was of no material value for Andy, broke financially and mentally, but he took me under his wing and changed my perception of what I saw when looking in the mirror which I cannot thank him enough for and will consider him a dear friend for life.

Andy has a general love for friends and family, like the time he single-handedly threw me a surprise 30th birthday party at his home, coordinating friends from New York to Boston while all wearing my signature style of choice – jeans and a white t-shirts. In more trying times, Andy was someone I could talk to following the death of my sister Jessi, and someone whom I have grieved alongside following the passing of our close friend Cory. Today, I can attest Andy's heart is as full as it has ever been and his head the clearest since knowing him and although he has made a mistake, I feel he has so much to give to not only family and friends, but to his community for years to come.

Judge Furman, I ask you to consider not only those contributions Andy has personally made as an entrepreneur, but also consider his dedication to family, friends, strangers and me. His ambition and constant drive for innovation have inspired me to continue along my career path and I honestly cannot say I would be where I am today if it had not been for meeting my friend for life, Andrew Bachman.

Thank you for the opportunity to share my feelings and I hope you consider all the good Andy can still do for this world.

Sincerely,


Joseph B. Pearce

# Exhibit G

Re: Letter of Reference for Andrew Bachman

Dear Judge Furman

I am attorney and a professor of law in Boston, Massachusetts.  I come from a long line of lawyers and am married to an attorney.  As such I have great respect for the law and the judicial process.  I must say that the changes that have occurred in the law in recent years due to technology have altered the landscape not only for those of us raised on yellow pads and pencils but for those in industry and commerce who must stay current to compete and interpret the law in a world that changes faster that our ability to sometimes keep pace.  I recently asked our state's attorney for one word to describe the law to my students and she responded ,  **"fairness".**   With that in mind I felt comfort in knowing that although the law evolves constantly it remains the same at its core.

I am writing this letter for a person that I have come to know as a businessman, an entrepreneur, a community leader, a client and a friend.  I do not have intimate knowledge of his past or what led to the need for this letter.  But I do hope that my observations will provide another window to view a young man who was evolving, may have made a mistake and is being asked to make amends for those actions.  At this point I must say that although I understand the sentencing guidelines I believe in umpires more than instant replay and I believe  in a judge's ability to weigh and balance more than a system pre-designed to check boxes and reach a result.  I also must say that I truly believe this country was founded on the willingness of our founders to take chances and risks for the betterment of society and those who can and do create and try,  may sometimes fail but society is better served by them serving us than being locked away .  If I were king I would sentence those who do wrong to work for the betterment of society and for those they injured.  I would make those who can only do physical labor work for the families injured or make white collar criminals work and have a portion of their earnings go to the less fortunate.  Jails and the cost of incarceration are an unneeded drain on society.

I first encountered Andrew Bachman when I was encouraged to assist a local "character" who lived like Thoreau but in a more visible place than Walden Woods.  Harold Watt collected refuse thrown on the side of the road and sold it to collect money for those he referred to as "in need".  In helping him to avoid foreclosure and eviction I discovered Andy Bachman who ran a local grocery store and deli.  It was at this store that Harold Watt ate his meals everyday and where he was treated not as a problem but as a neighbor.  As I learned more about Andy Bachman I learned that he also did similar "feel good" acts for seniors, veterans and almost anyone in need of a helping hand.  We were not contemporaries, we were not friends, but a friendship developed when I realized that this young man was not a free spirit or a modern hippie.  I realized that he was a young entrepreneur  who  truly believed that whatever talent

he has should be used to make his world better. Now whether that was always his goal or is a new found faith I really don't care.  He is one of the few people that I have met of his generation who embraces the theory that a high tide raises all boats.  And again without commenting on this current matter before this court, my interactions would indicate that his past actions are not truly reflective of this man or his character.

It would appear that Mr. Bachman is accepting responsibility for his actions.  It is also clear that prison time might seem to be a benefit to some like the prosecutors or even his sentence could be used as an example to others but I firmly believe that in my 30 plus years of practicing law and encountering those who make mistakes and career criminals that Andy Bachman's incarceration would benefit no one.  A probationary sentence with a form of restitution either of a portion of his earnings or by making use of his knowledge to identify others who may try to defraud or injure other people who do not have the requisite understanding of the electronic age, technological advances or the ability of the internet to changes lives with a push of a button.  Or maybe just helping  seniors in his community communicate with their grandchildren on the internet.

Your honor with all due respect you have an opportunity to change many lives by having Andy Bachman spend his life helping others rather than throwing another talented person on the scrap heap of humanity.

I thank you for reading my letter and I wish you well in your deliberations.


Sincerely


Brian R. Cook

Dear Judge Furman,

I am writing to attest to the engaging character of Andrew Bachman, a close friend of mine for 15 years.

I met Andrew during our freshman year at Babson College, where we lived in the same hallway and shared a few classes together. Andrew and I couldn't have been more opposite – I was a skinny, finance nerdy guy who would read the Wall Street Journal for fun, the son of immigrants, and a bit of an introvert. Three doors down was Andy, the vivacious gym buff who managed to befriend most of the dorm within the first week, the epitome an all-American guy. Andrew didn't judge me, nor engage in petty character assassination that should have ended after high school, but to my surprise, was still prevalent in higher education. Our friendship grew from there – Andrew helped me with the weights and self-confidence, I helped him with the books. What started out with feelings of reservation turned into reciprocal respect and when I sought Campus Life approval to start a dorm floor dedicated to students interested in investing, Andy helped me fine-tune my pitch. After winning approval, I moved into this new dorm with 20 other students, and Andrew was now only one door away.

Sophomore year living right next to Andy was one that I fondly remember. Sure, we went into Boston to party on Saturday nights often, but it was the late nights hanging around the dorm, talking about stocks, girls, politics, and life in general that I really cherish. When my father underwent a bypass surgery, Andy was there to speak to, a shoulder to lean on, and offered me his car to drive down to New Jersey to visit my parents. I remember that summer of 2004 when I was interning in Tel Aviv and living with my grandmother, Andy would call and try to charm my grandmother with a few botched Yiddish phrases. My grandmother didn't understand much English but she would always smile when he called and told me that, "Your friend Andrew has a lot of spirit. We need more of that." That summer Andrew interned at a clothing company in New York and when we returned to campus in the fall, he had generously donated to my ever-improving wardrobe.

Never one to remain in one place for too long, Andy lived in a different theme housing dorm junior year, and lived in an off-campus house during senior year. Our friendship continued to grow and as Andrew started jumping into entrepreneurial endeavors that were becoming successful, he always remembered his friends. During graduation weekend, Andrew's parents hosted a party and after meeting his parents, my parents understood why I valued my friendship with Andy so much – he came from a good family. They say the apple doesn't fall far from the tree, and like his parents, Andrew is compassionate, hard-working, sincere, and a genuine person.

After graduating, I took the comfortable route of working for a bank – I was content with a nice salary and living in NYC. But not Andy. He wanted to build something, and as a second generation American that is something I have tremendous respect for and wish I could muster the courage to take that risk.

Alas, like any opportunity seeking individual, there are temptations to take some short-cuts and unfortunately this is where Andy had a lapse in judgment.

When I would travel up to Boston for a college or fraternity reunion following the first 4 years of graduation, Andy made sure we caught up over dinner.  At the time, Tatto Media was an aspiring marketing network and while it wasn't generating multi millions in monthly revenue, it seemed to me that with time, patience, and continued market penetration, they would get there. Andrew's face would light up when talking about the company and technology they were using, but then express frustration

that they money wasn't flowing in yet. I expressed my confidence in him and the company and conveyed how good things take time.

Over the next year or so, I became incredibly engrossed with my work as the markets started turning and I hadn't seen Andy in person but we would speak regularly via phone. When my boss had offered me a chance to travel to Hong Kong and help the local team, I had my reservations and confided in Andy. "What happens if it's a one-way ticket? Am I being set up to take the blame, after-all that desk hasn't made any money in years, what can I bring" Andrew slapped the doubt out of my head and encouraged me to take the shot – it was a smart calculated risk that worked out. While I was overseas, Andy checked in via Skype and it was becoming obvious to me that the money was starting to roll in for him. One night when we were on skype, I was expecting to hear a story of a night out on the town in Boston.

Instead, Andrew was flying out to Joplin and paying the airfare for a few other friends, to help the community deal with the devastating tornados that ravaged the area. While the prosecution might point to Facebook pictures of Andrew driving his Ferrari and living it up in Boston as proof of his indifference, these are ephemeral in my mind and don't portray the real Andy – they were created to craft a false marketing image.  It is the pictures of Andy helping residents of Joplin, which were not plastered all over Facebook, that will always be seared into my brain, the real Andrew, who would take the shirt off his back to give to a person in need.

Andrew's generosity and desire to help others never wavered and he wanted to make sure that his close friends shared his view towards charity. In April of 2013, Andrew told me and a few friends he was coming down to NYC and to make sure we were free. I was expecting we would go to a fancy steakhouse, catch a Yankees game, and go to some west village nightclubs. Instead of frivolously spending money on those activities, Andrew donated over $10,000 for a group table at a Hillel charity poker tournament event. After we got there, Andrew encouraged us to get involved, either financially or with our personal time, and make a difference. Andy's words and actions stuck with me, and I soon joined the board of Hillel, as I realized the money I was fortunate enough to be earning, wasn't meant to keep in my pockets – I should give back.

And that is what Andrew does, he gives back. The FTC settlement highlights all the assets Andrew had, but it does not highlight the intangibles -the good Andrew has done, the friendships he has nourished, the confidence he had inspired in others. It also doesn't convey the remorse and guilt Andrew was feeling as the situation began to spiral out of control. A few months after the poker tournament, I noticed Andrew wasn't himself, he wasn't happy, something was eating at him and while he would never show weakness, it was clear to me that something was weighing on him. After I heard the news from some other friends, I understood.

I believe Andy's behavior in the cramming scheme was an aberration, a lapse in character that was exacerbated by the envy and greed generated by the sight of other entrepreneurs striking it rich during the mobile and social media revolution. And let's not kid ourselves, plenty of these entrepreneurs have done aggressive and questionable things without showing a hint of remorse or facing a judge. I am not suggesting this justifies Andrew's actions, but like other times in history of irrational exuberances, man's desire to maximize his profit potential can and unfortunately will always lead to questionable actions. In the dot com craze, Wall St bankers pumped worthless internet startups and penny stocks into the hands of elderly people who lost a significant amount of their life savings. Mortgage bankers were preying on subprime customers and pitching them houses they couldn't afford, only to foreclose on them and kick them to curb within months after rates rose and prices crashed. And after those episodes, the bankers

kept their bonuses and assets and were not subjected to the trials that Andrew has had to deal with. Andy's crime was not victimless- recurring monthly charges add up, as does the frustration of trying to get out of the subscription. However, I believe it pales in comparison to the situations mentioned above, and ignores the complicity of the wireless carriers who were able to buy their way out for a fraction of what they earned over the years.

Judge Furman, Andrew has spent the last four years reflecting on the mistakes he has made. He has kept himself busy with more humbling entrepreneurial endeavors, spent more time with his family and loved ones, adopted a dog, and has realized there is more to life than a quick buck.  I'm sure Andrew is ready to accept any sentence handed to him, but I ask for your leniency. The world will be a better place if Andrew is placed on probation and he can continue to make amends for his past mistakes.


Respectfully Yours,
 Chaim D Pizem

**University of California**
**San Francisco**



**Department of Epidemiology & Biostatistics**
Mission Hall: Global Health & Clinical Sciences Building

10 April 2018

**Isabel Elaine Allen, PhD**
Professor, Division of
Biostatistics
Department of Epidemiology
& Biostatistics

University of California,
San Francisco

UCSF Box 0560
550 16th Street, 2nd Floor
San Francisco, CA 94158

Tel: 415/ 514- 8148
Cell: 508/ 667-7737
Isabel.allen@ucsf.edu

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Furman,

I am writing in support of leniency in the sentencing of Andrew Bachman. I have known Andrew since his freshman year at Babson College (2002) and we have kept in touch both formally and informally throughout his courses and education as an undergraduate (2006) and the years since his graduation.  I am now a Professor Emeritus in Mathematics & Entrepreneurship at Babson College and a Professor of Biostatistics at the University of California, San Francisco and have been in communication and visited with Andrew many times since his graduation.

Andy was a student in most of the quantitative courses I taught at Babson College including basic and advanced statistics, multivariate methods, and analytics.  While he is very smart, having learning disabilities requiring extra time for understanding fundamental mathematical concepts made my advanced courses a struggle for Andy at a very competitive school.   He worked extremely hard but he loved the courses and the challenges he could overcome. He persevered to the point where he was a leader in these courses, able to work with other students since he understood the material so well.  In particular, I remember Andy's work with one of the other students who, during the first semester of multivariate statistics and continuing into analytics the next semester, began suffering from a debilitating chronic illness.  He visited and worked with her and kept her up to date on the class and the assignments throughout the semester.  His compassion for her and his generosity in giving his time (without which she would have had to drop the class) and without any push from me were remarkable and so in character for the Andrew Bachman I know.  Remembering this makes the accusations against him seem quite out of character.

Following graduation, Andy was a regular visiting alumni lecturer in my advanced classes. He is an excellent teacher and cheer leader both for Babson College and for analytics as a necessary tool for all graduates to understand.  If I were still teaching these courses to undergraduates in Boston I would not hesitate to invite him back each year since the

qualities he brought to Babson College are still a major part of his life. Andrew's gifts of compassion and generosity, combined with his ability to teach, would be an excellent reason to give him a sentence of community/educational service since he can immediately give back to society in a very productive way.

Keeping in touch when I visited Boston or Andy visited San Francisco always involved time discussing new methodologies in statistics and analytics. He is a lifelong learner with great capacity to learn and change from mistakes he has made. Andrew is the kind of student I love to teach, he has the ability to acknowledge and understand mistakes he has made but, given a second chance, he will find the correct answer. His compassion and generosity, and his ability to overcome challenges and to keep learning, are such important qualities, I hope you will give him a second chance.

Yours truly,

Isabel Elaine Allen, PhD
Professor of Epidemiology & Biostatistics
Faculty, Global Brain Health Institute
University of California, San Francisco
San Francisco, CA

James H. Shane

20 Rowes Wharf

Suite 305

Boston, Ma. 02110

617.510.3888

jhshane@aol.com

April 9, 2018

Honorable Jesse M. Furman

Unites States District Judge

Southern District of New York

Thurgood Marshall United States Courthouse

40 Foley Square

New York, New York 10007

Dear Judge Furman,

My name is Jim Shane and we presently reside in Boston. Prior to that we lived in Wayland, Ma. where I have known Andy Bachman and his family for most of his life. Andy's parents, both physicians, have been friends since the '70's. His Mom, a pediatrician, was doctor to our two daughters growing up. His two sisters went to school with our daughters through high school. His sisters are quite accomplished, one a research physician and the other a college professor with a PHD.

I became much closer to Andy when he was about 6 years old. During a Walk for Hunger he tired early and I carried him on my shoulders for the next 8 miles or so. He was much lighter then and I in better shape. I watched him grow as an intelligent, inquisitive young man and was happy to see him go off to Babson College. Since he was not far from home, I would see him often. He always had an infectious smile and charming personality. A born salesman and entrepreneur.

After college we became much closer. I think I can take a modicum of credit for his success and perhaps a small amount of blame for his downfall. I lent him his first seed money that he quickly grew into a rather sizeable sum. He promptly paid back the loan. I encouraged him to develop his clear entrepreneurial skills and was proud when he would introduce me as his mentor. Soon he was off on his

own, flying higher that one might have imagined. "Give them anchors and wings" was the byword of the nursery school where all of our children attended. Andy certainly soared. The blame that I often feel is that I did not pull back on the anchor line a bit, checking his wings and making sure he was flying straight.

It was not merely the making of money that was so impressive, but also what he did with it. He learned early the importance of giving back. He helped finance his sister's venture to de-nature pig mesh and use it for gun shot wounds and hernias at the University of Missouri. He established a scholarship at Babson College to help students less fortunate than himself and provided seed money to as many young entrepreneurs as he could. He was often a guest speaker at college, public and private events to share his experiences and knowledge. He gave to charity and was particularly supportive of Hillel International, where I am deeply involved. We traveled to Israel together a number of years ago and he was a gentleman to everyone he met. He is loved and appreciated by all that have come to know him.

I can only imagine the possibilities for Andy in the future. I would hope there can be a way to encourage that future now that he has gained a more balanced perspective. He has clearly done things that he should not have done and has taken responsibility for his actions. I am prepared to speak personally in his behalf and also to make myself available in anyway to continue the mentoring that began years ago. Perhaps this time the anchor line could be held tighter while still giving the eagle the space to fly. Soaring, accomplishing, returning to earth from time to time and making us all proud of the choices that we have made, in spite of some not so perfect ones he has made.

Very truly yours,

James H. Shane

Jessica Bigge
6 Billings St.
Randolph, MA 02368

April 7, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007


Dear Judge Furman,

I am writing you on behalf of my good friend Andrew Bachman. I have known Andrew 'Andy' Bachman since we were in 1st grade Hebrew School class, almost 27 years ago. I was both troubled and surprised to hear about Andy's recent case as he has always been such a loyal friend. It is for this reason that I am writing you this letter. I understand the seriousness of this matter however, I hope the court will show some leniency.

However it is unfortunate that Andy has made some bad decisions, Andy has always been a loyal friend whom I could always count on. In our friendship, Andy has really been there for me when I was trying to find myself, who I wanted to be and what I wanted to do with my life. After college I moved across the country to Colorado. I didn't know anyone there but I just knew I needed a change. When I got there I found Andy was just a phone call away. He always answered the phone, always had faith in me - encouraged me to be the best me, and just pushed me in the right direction. I became an adaptive Ski instructor then got a summer job bussing tables at the hottest restaurant in town and moved up to General Manager within 6 months. It is because of Andy that I didn't give up, followed my heart and became the person that I am now.

While I was surprised to hear of the misconduct, it comes as no surprise that he is ready to accept responsibility for his actions. I believe that as Andy moves forward, he will and has already become a better person. Andy has expressed deep remorse to me regarding his misconduct.

It is my sincere hope the court takes this letter into consideration at the time of sentencing. Despite the current case, I still believe Andy to be an honorable individual and a good human being.


My Kindest Regards,


Jessica Bigge

March 26, 2018

Joan Arbetter Rosenberg
PO Box 81388
Wellesley, MA
02481

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Furman

Andy Bachman has been like a second son to me for a decade. He is around the age of my eldest son. We have had holidays, vacations, happy occasions and funerals with each other to connect and console. He is generous in every way-sharing ideas, helping each other, and just being Andy the "hub" amongst our friends and family. My own kids have improved their habits and became oriented toward exercise and health because of Andy! He picks people up when they need it the most. He thrives in giving.

Andy is a very hard worker. He enjoys work, facing challenges and strives toward excellence. Among the myriad of people that I know, Andy Bachman is sure to meet his current situation with grace and fortitude. We have encountered troubling times with a friend who recovered from substance abuse and Andy was a steadfast friend. His closest friends share a sense with him that though there may be imperfections, we collectively support each other and feel committed to being the best possible version of ourselves.

Andy is a central part of our lives and we know he is on an uphill course. His involvement with our children, his role as we strive for personal health and growth (via fitness, healthy eating and living, and his companionship) and his participation in lifecycle events is healthy for him and is essential to those around him. On behalf of my family and as a strong advocate myself, I am certain that a lenient sentence for the legal matters at hand is an excellent choice. Andy will repair and rebuild. He will be present to support and strengthen his close community, as always, as he strengthens himself. He will be diligent as he repairs past failings. We need Andy to continue to nourish his local community, friends and family.

Please do not hesitate to contact me so that I might be helpful.

Sincerely

Joan A. Rosenberg

Mrs. Joanna Beaton Shames
16 Black Oak road.
Wayland, Ma. 01778
508-395-0605


The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

April 1, 2018
RE: Andrew Bachman

Your Honor;

   I am an educated, middle-aged, proud housewife with three grown children; all were highly educated; and all grew up to be strong, independent, and productive adults. We are all from the town of Wayland, Massachusetts. I can reinforce my resume with various work experiences; impressive ones, including creating and owning my own successful  company; but those pale in comparison to my most important role in life, and that has been being a mom; and In that role, I met Andrew Bachman.

   When I met Andy, he was a little, skinny, adolescent with a huge, enthusiastic personality that was larger than life. My son, Craig, and Andy became very close friends; especially once they entered high school and were on the wrestling team. Wrestling families become very close. We spent many hours in the gym together, creating a bond of healthy competitiveness, confidence, friendship, and most of all good sportsmanship. We, also, spent many hours together outside the gym; reinforcing team spirit by hosting weekend parties, bbqs, and pot lucks. Needless to say, I feel I know Andy very well, and am qualify to speak of his character.

   Many of the high schoolers spent many hours at our home. My son was very social and I felt more confident having his friends come to our home.  I would sit endless hours on the top of the stairs supervising and chaperoning many nights of gatherings.  Of all the kids that came and went, Andy was the only one who would come over to me, sit down, and ask how I was doing. This meant a lot to me, as it gets lonely and tedious to spend your evenings watching over the young crowd. Andy and I developed a special bond which lasted to this day.  We would talk of life, his ambitions, his love of family and friends.

   Andy was a young man who had hopes and dreams, and a promising future.  Mature beyond his years, he would face challenges life presented, find a solution, and carry on. Andy was part of my car pool from school, and he would share what he had planned to prepare for dinner for his parents, not on a special occasion, but on a daily basis. He was that kind and caring guy who tried to make his parents happy, and do what he could to contribute to their busy household.

   As time went by, Andy and I remained friends, meeting for lunch and discussing events in our lives.  As busy as he got, Andy would always take the time to come to family birthdays, and making it special in one way or another.  He grew up to be a generous young man; always thinking of others, and never forgetting to ask me how I was doing.

   Andy is a people pleaser, going above and beyond to keep connected to friends and family.  He worked incredibly hard to make his mark on the world; yet always tried to balance his busy schedule with shared social memories. I remember our family met up with Andy on vacation.  He would care for our every need, ensuring our trip was memorable.  I remember watching Andy during quiet times, while we all relaxed,  he would step out and start working again.  This work ethic was admirable, and I often envied his drive.

   Now I understand, this drive led to a misguided path.  I know Andy; I know he is intelligent, and acknowledges the wrong path that he took to achieve his goals and aspirations was a very bad decision.  I believe with my whole being that the lesson was not lost on him.

   Respectfully, I have hope that Leniency in Andy's sentencing will be considered for several reasons.  The first is for Andy; he is a young, productive, considerate human being, who has too much passion and love to contribute to the well being of others to be incarcerated. Probation would allow for him a second chance to right the wrongs, and to find the right path to give back and contribute to our society. The Andy I know would not allow himself to ever get lost again on the wrong path. Lastly for me,  if put away,  in this crazy busy world, who would be there for me to ask how I am doing?
I know it's selfish, but not many people in my life do that, and it helps me to remain focused on the good in people.

Sincerely,

Joanna Beaton Shames

2 Magona Circle
Orleans, Massachusetts
April 4, 2018

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
Thurgood Marshall United States Court House
40 Foley Square
New York, New York 10007

Your Honor,

I am writing this letter on behalf of my son,
Andrew R. Bachman, who has pled guilty to charges
of illegal marketing practices. Of course, as a mother,
this is a heart-breaking matter. He was raised in an
intact and loving family. We took great joy and pride
in his youthful progress & accomplishments. Sadly,
Andrew was challenged by late physical and emotional
maturation, as well as mild learning delays. In order
to achieve social acceptance and popularity, he felt a
need to "buy" friends. Perhaps this was the learned
lesson that drove him to seek celebrity as a
precocious business person.

Andrew was a Co-captain for his high school
wrestling team, where he trained diligently for four
years - from a ninety-five pound Freshman (too
small to compete) - to a Senior year medal winner.
Younger children have always been drawn to Andrew,
as he to them. He coached a young blind boy for
his Bar Mitzvah project as tutored a learning disabled

lad several times a week during high school.
His summers were spent as a favorite camp counselor.

Financially successful personalities always
fascinated Andrew. He elected a business course in
school for which he was recognized as the top
honors student - his first academic achievement.
He then went on to attend Babson College in Wellesley,
Massachusetts - an institution known for its excellent
entrepreneurship program. He graduated with honors in 2008.

At Babson Andy's fellows recognized his leadership
qualities and nominated him to direct a major class
project his first year. However, he felt that he
lacked the technical skills which would be essential to
building a career. Thus, he pursued relationships with
other students seen as computer "whizzes." Together
they created small companies during college. After
graduation he was recruited by them to become
part of Tatto Media. This enterprise rapidly
developed into a highly profitable platform in the
on-line marketing field.

While Andrew was enjoying the lifestyle that
this success allowed, he generously gave back to Babson.
He returned to speak in the classroom & endowed a
four-year scholarship. He underwrote many projects
for new concepts that younger students proposed to him,
with no thought nor expectation for personal gain. He
continuously shared his home with other fledgeling
entrepreneurs. In 2013 he Co-Founded building

a school in Guatemala, through the foundation Pencils of Promise.

Andy's generous, outgoing, fun-creating personality is unfortunately hampered by no cynicism of others and naive gullability. I have never known him to willfully hurt anyone nor anything.

Since federal charges were brought against him as his world imploded, Andrew has been struggling to maintain a positive world view. I understand that the guilty plea could result in his being sentenced to long years in prison – or at the very least – hampering probation. I am not privy to the number of individuals purportedly injured in this case, nor the extent of the damages that would be attributed to him. I do believe that the "punishment fit the crime." Also, I believe that true justice have in its core mission, actual rehabilitation of the wrong-doer. I fear that the scope of sentences available to you may be more damaging to Andrew Bachman, than educational for both the public and himself.

Andrew, now aged thirty five, should be at the most socially and personally productive years of his life. His incarceration would hardly recompense those his actions are to have injured, nor place him in a safe environment for correctional treatment. I believe am certain he has learned a crucial lesson already.

He is presently living a quiet life, with only his dog for companionship. My husband & I own a small market/deli in Hanover, Massachusetts which he has been managing seven days a week - each day for long, arduous hours. He had to develop this from the ground up and is creating something unique for the town. There is no other person who would fill this position for us. Were he not there, we would have to sell and experience a significant loss. We could sustain such monetary losses but would be crushed by the damage it would do to our son.

In light of what I have related, I am requesting leniency in your sentencing.

Karen J Back

The Honorable Jesse M. Furman                                    04/23/2018
United States District Judge
Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007

Dear Judge Furman,

My name is Robert E. Dickey and I am a seasoned businessman, having owned and
partnered in many different businesses. In my first career, I was a high school
guidance counselor in rural Ohio schools for 30 years. I believe I became a very
good judge of character and goodness in young people.

I was introduced to Andy Bachman while on a business trip to Panama. I was
attracted to Andy's winning personality and his passion for business. Over the
nearly ten years that I have known Andy, my fondness for him has grown fonder. I
usually close my phone or personal contacts with Andy with both of us telling each
other that we love one another. He is a very special young man in my life by virtue
of the goodness that I see in Andy.

Andy has helped many people who are less fortunate; both in his inner circle of
friends and acquaintances and into the larger world. I have seen him help friends
with serious mental health issues and with very real personal problems. In 2012 we
each donated enough money to the Pencils of Promise program to build an
elementary school in Guatemala for 80 elementary aged children. We also provided
for a teacher and supplies for the children. He has also participated in summer
youth camps in Massachusetts where inner city youths are exposed to positive role
models.

I don't fully understand the nature of the crime to which Andy has pleaded guilty,
but I do know that I invested in the company for a very short time and then Andy
told me that he did not want me to stay on as an investor because he had concerns
about the leader of the company and I got out of the deal. I am grateful that he
encouraged me to sell my shares.

Andy comes from a very good family. And, he is a very good person. I am sorry that
he got into an illegitimate business that now has tainted his reputation. While he
knows that he did something wrong and has plead guilty to an offense, I see no
reason to sentence Andy to a prison term. I believe he has been humbled beyond
the experience and has served a sentence already by having all of his material
possessions seized and having to start a new life with the threat of sentencing
hanging over him every day for the past several years.

I believe that the world will be a better place by having Andy continue to work at his
little store, and keep his employees actively employed and if need be, let him

provide additional community service: but, putting him in prison will serve no useful purpose. (It will only cost tax payers money to both incarcerate him and to have his employees claiming unemployment at the closing of his store.)

There were times over the past few years when Andy and I talked long into the nights. He was terribly depressed and felt great remorse for letting himself down and for disappointing his parents and other loved ones. He even talked about ending a life that had been so disrupted by the business mistake and personal choice that he made. I continually told Andy that we all make mistakes. I also encouraged him to ask his family for support and forgiveness. I believe he is closer to his parents today than at any other time in his life. They have forgiven Andy and they are hopeful that the court will forgive him as well.

Your Honor, a mistake in judgment by an aggressive young businessman on a first and last offense should not warrant a prison sentence in my estimation. I am asking the court to forgive Andy Bachman and let him proceed on a corrected path in life.

Sincerely,

Robert E. Dickey